## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**BRIAN GOOLSBY,**

**Petitioner,**

**v.**

**MICHAEL MELVIN, Warden,**
**Pontiac Correctional Center,**

**Respondent**.

Case No. 17 cv 00165

Judge Mary M. Rowland

## MEMORANDUM OPINION & ORDER

Brian Goolsby has filed a petition for a writ of habeas corpus, 28 U.S.C. § 2254, challenging his conviction for murder. In his petition, he presents two ineffective assistance of counsel claims: 1) his attorney failed to investigate and call John Elmore, Benita Jackson, Paris Henderson, Donna Henderson, Kianta Britten, Tiana Williams, and Martin Lopez as witnesses; and 2) his counsel failed to prepare an adequate defense. (Dkt. 1 at 5-6) For the reasons that follow, Goolsby's petition [1] is denied, and no certificate of appealability shall issue.

## BACKGROUND

When considering habeas petitions, federal courts must presume that the factual findings made by the last state court to decide the case on the merits are correct, unless the petitioner rebuts those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Goolsby has not provided clear and convincing evidence to rebut the presumption of

correctness here, so this factual background is taken from the state court's findings. *People v. Goolsby*, 2016 IL App (1st) 141378-U.

## 1. Trial

Following a jury trial, Defendant Brian Goolsby was found guilty of the first-degree murder of seventeen year old Terrell Davis and sentenced to 85 years' imprisonment. At trial, the victim's sister Antoinette Brayboy testified that at around 1 a.m. on October 6, 2005, the victim left the family residence. Brayboy lived with the victim, her mother, and her grandmother. Approximately an hour later, Brayboy's grandmother heard gunshots. When the victim did not return home, Brayboy and her mother left the house and walked to the nearby intersection of Campbell Avenue and 63rd Street, where it appeared there was "something going on." *People v. Goolsby*, 2016 IL App (1st) 141378-U, at ¶ 3. While walking, Brayboy observed Goolsby sitting in a vehicle. A man known as "Lucky" entered the vehicle and drove away with Goolsby. Before Brayboy reached Campbell and 63rd Street, she learned that her brother had been shot.

Johnny Hardin, an acquaintance of both the victim and Goolsby, gave a statement to an Assistant State's Attorney (ASA) and testified before the grand jury that around 2 a.m. on October 6, 2005, he was leaving his girlfriend's house near Campbell and 63rd Street. As he walked, he saw the victim run through a vacant lot. A few seconds later, he observed Goolsby (whose face was illuminated by the streetlights) chase after the victim. Hardin witnessed the victim fall near the end of the vacant lot where Goolsby caught up with him and shot him two or three times

with a chrome gun. Hardin claimed to have witnessed Goolsby throw the gun onto the roof of a building as he fled the scene.

At trial, Hardin—who had four prior felony convictions for drug possession—recanted the statements he made to the ASA and the grand jury. He testified that on July 23, 2006, as he was driving his children to school, the police stopped him, recovered a gun from his vehicle, and brought him to the police station. Police questioned Hardin for several hours regarding the murder. Eventually, Hardin and the police came to an "arrangement" in which Hardin would implicate Goolsby in the victim's murder. In exchange, the police would not charge Hardin with possession of a firearm, and the Illinois Department of Children and Family Services would not take away his children. At trial, Hardin testified that he made his statements to the ASA and the grand jury in accordance with this arrangement. He also testified that, in October of 2005, he was on electronic monitoring at his sister's residence and if he traveled more than 100 feet from there, the sheriff's office would have been alerted. As such, Hardin testified that he did not leave his sister's house on October 5 or 6, 2005 and did not actually witness Goolsby shoot the victim. Because Hardin recanted at trial, his prior inconsistent statements identifying Goolsby were admitted as substantive evidence under state law. *People v. Goolsby,* 2013 IL App (1st) 103358-U, at ¶¶ 74-77 (explaining that, under 725 ILCS 5/1156-10.1, prior inconsistent statements are admissible as substantive evidence as long as certain statutory requirements have been met); *see also People v. Armstrong*, 2013 IL App (3d) 110388, ¶ 23, 987 N.E.2d 1040, 370 Ill. Dec. 274 (recanted admitted prior inconsistent

statement alone is sufficient to prove a defendant's guilt beyond a reasonable doubt); *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 23, 954 N.E.2d 718, 352 Ill. Dec. 635 (trier of fact may consider a prior inconsistent statement introduced as substantive evidence under 725 ILCS 5/1156-10.1 the same as direct testimony by that witness; convictions supported by a substantively admitted prior inconsistent statement may be upheld even though a witness recants at trial) (overruled on other grounds).

Mark Love—who had four prior felony convictions at the time of the trial and knew both Goolsby and the victim—provided grand jury testimony that a day or two before the murder, during a separate altercation between Love and Goolsby, the *victim* told Goolsby that he "hit like a bitch." According to Love, Goolsby told the entire group of observers that it was "cracking" (*i.e.*, there would be a fight or a shootout), and Love was afraid Goolsby would return and "do something stupid." However, at trial, Love testified that *he* told Goolsby that he "hit like a bitch." While testifying at trial, Love also denied that the victim had made this remark and could not recall telling the grand jury that the victim made this remark. Love also clarified that Goolsby told only him that it was "cracking" between them, despite testifying to the grand jury that Goolsby said this to the entire group. Because Love testified inconsistently regarding who had taunted Goolsby and whom Goolsby threatened in response, his prior statement to the grand jury was admitted as substantive evidence. (Dkt. 13 ¶ 8); *People v. Goolsby*, 2016 IL App (1st) 141378-U, at ¶ 9.

Damion Dorsey testified at trial that he knew both Goolsby and the victim. Sometime around October 1, 2005, Damion was with a group of people that included

Goolsby, the victim, and Lucky. Damion's cousin and Lucky got into an altercation, and Goolsby punched Damion in the face. The victim started "laughing, hooping and hollering" and called Goolsby a "big pussy." (Dkt. 13 ¶ 6)

Damion's brother Delwin Dorsey—who had four prior felony convictions—provided a written statement to an ASA in which he stated that the day before the shooting, he had a conversation with Goolsby outside a store where they discussed the feud between Goolsby and a group of people, including the victim and Love. Goolsby apparently told Delwin that it was "cracking" between him and the group. Delwin stated that he saw Goolsby point a chrome .380 handgun at the victim and threaten to kill him on the night of the murder. His statement also declared that on a phone call with Goolsby the next evening, Goolsby admitted to the murder on speakerphone.[1] While on speakerphone, Goolsby described shooting the victim once, chasing him down and then shooting him again, and then finally shooting him twice more as he lay on the ground. Delwin testified similarly before a grand jury, stating that on the night of the murder, Goolsby threatened the victim with a gun, telling him it was "cracking" and that "y'all all signed your death certificate over to me," and that on the phone call the following evening, Goolsby admitted to chasing the victim down and shooting him. (Dkt. 13 at 5) (citing Ex. A, ¶ 38) Delwin's statement also

---

[1] Delwin's brother Damion also testified at trial that he heard this phone call, as he was with his brother when Goolsby called. Damion testified that, on the phone call, Goolsby bragged about killing the victim.

claimed that, while on speaker phone, Goolsby told the group that he saw people talking to police and that it was "cracking."[2]

But Delwin recanted at trial. He acknowledged speaking to the police, giving a statement to an ASA, and testifying before a grand jury. He explained at trial that he spoke to the police and the ASA only after Chicago Police Detective Sayan Sampin forced him at gunpoint to accompany him to the police station, and because he felt that he could be charged as an accessory to the murder. He denied telling the ASA and the grand jury that Goolsby threatened the victim, and denied that Goolsby described the murder on the phone. Delwin did, however, acknowledge that Goolsby told the victim "they sign they death certificate." *People v. Goolsby*, 2016 IL App (1st) 141378-U, at ¶ 15. As with Hardin and Love, Delwin's prior inconsistent statements describing Goolsby's admission were admitted as substantive evidence.

Detective Sampin testified at trial that he investigated the shooting. According to Detective Sampin, two weeks after the shooting, Hardin and Delwin approached Detective Sampin while he was searching nearby rooftops for the gun. Hardin told Detective Sampin that he was searching the wrong roof. After Detective Sampin asked Hardin to direct him to the correct roof, Hardin walked away. Detective Sampin then asked Delwin to come to the police station. Delwin declined, stating that Goolsby had people watching "all the time," and he could be killed for speaking to the police. *People v. Goolsby*, 2016 IL App (1st) 141378-U, at ¶ 17. However, Delwin later came

---

[2] Delwin explained that "cracking" could mean "fighting," a "shootout" or "[i]f someone like [does] something you [and] you was talking about doing something back to them." *People v. Goolsby*, 2016 IL App (1st) 141378-U.

to the station voluntarily. Detective Sampin denied ever pointing a firearm at Delwin, or threatening Hardin with criminal charges, in exchange for a statement. Detective Sampin testified that all statements were given voluntarily.

The medical examiner testified at trial that the victim's death was caused by multiple gunshot wounds. The parties stipulated to a forensic scientist's testimony that the bullets recovered from the victim's body were .38/.357 caliber, all fired from the same firearm. The police never recovered a gun from the crime scene.

The jury found Goolsby guilty of first-degree murder, additionally finding that Goolsby personally discharged the gun that caused the victim's death. Goolsby's trial counsel filed a motion for a new trial, contesting the sufficiency of the evidence. Thereafter, new counsel for Goolsby filed an appearance and two supplemental motions for a new trial. After trial counsel withdrew, new counsel argued that trial counsel was ineffective for failing to investigate and present several witnesses. In affidavits attached to the supplemental motion, Kianta Britten and Tiana Williams stated that they were present during the altercation between Goolsby and Love, and they did not hear the victim mock Goolsby.

At a hearing on the posttrial motions, Goolsby testified that he had approximately five conversations with trial counsel while trial counsel represented him. Goolsby claimed to have given trial counsel the names of four alibi witnesses: Paris Henderson, Donna Henderson, Benita Jackson, and John Elmore. Goolsby testified that trial counsel told him that he doesn't "put on alibi defenses," and refused to contact the witnesses. *People v. Goolsby*, 2016 IL App (1st) 141378-U, at ¶¶ 23-24

When trial counsel testified, he acknowledged telling Goolsby that he does not "put on alibi defenses," but claimed Goolsby only gave him the names of two potential witnesses: John Elmore and Paris Henderson. Trial counsel testified that he later learned about Donna Henderson from Goolsby's family.

Trial counsel testified that he reviewed the handwritten statements and grand jury testimony of Paris Henderson and John Elmore, as well as the police reports related to their interviews. According to Henderson's prior statement, she was drinking and playing cards with Goolsby between 1:00 a.m. and 4:00 a.m. on the night of the shooting, but claimed that Goolsby left and returned at some point during that timeframe. Henderson could not remember when Goolsby left or when he returned, and was thus unable to account for his whereabouts at around 2:00 a.m. Trial counsel therefore concluded that Henderson "would make a very poor alibi witness." *People v. Goolsby*, 2016 IL App (1st) 141378-U, at ¶ 25. According to Elmore's prior statements, he was intoxicated on the night of the shooting, and that fact weighed into trial counsel's decision to not call Elmore as a witness. Trial counsel acknowledged knowing about Donna Henderson and Benita Jackson. He did not, however, interview any of the potential alibi witnesses.

The trial court denied Goolsby's motion for a new trial. "Although it found trial counsel's aversion to alibi defenses 'curious,' it did not find trial counsel's overall representation of [Goolsby] objectively unreasonable, or that prejudice resulted from his alleged errors." *People v. Goolsby*, 2016 IL App (1st) 141378-U, at ¶ 26. Goolsby was subsequently sentenced to 85 years' imprisonment for first-degree murder which

included a mandatory 25-year enhancement for personally discharging the gun that caused the victim's death. Goolsby appealed.

## 2. Direct Appeal

On direct appeal, Goolsby argued that his trial counsel was ineffective for failing to investigate and present John Elmore, Paris Henderson, and Donna Henderson as alibi witnesses. *People v. Goolsby*, 2013 IL App (1st) 103358-U. The state appellate court rejected the ineffective assistance of counsel claim. It determined that trial counsel was not ineffective for failing to interview John Elmore and Paris Henderson. The appellate court held that trial counsel's performance was reasonable and that Goolsby was not prejudiced by trial counsel's performance.

Goolsby then filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court, which the court denied. *People v. Goolsby*, No. 116571, 2013 Ill. LEXIS 1554. Goolsby's direct-appeal PLA raised only a single sentencing issue. He did not include any ineffective assistance of counsel claims in that PLA.

## 3. Post-Conviction

In February 2014, Goolsby filed a *pro se* post-conviction petition, arguing that trial counsel was ineffective for failing to investigate and present Benita Jackson, John Elmore, and the Henderson's as alibi witnesses. Goolsby stated that Jackson was not available at the time of the trial or the direct appeal, and that affidavits could not be obtained from Paris or Donna Henderson. Goolsby attached the affidavits of Elmore and Jackson to his petition. Jackson's affidavit stated that she saw Goolsby

enter a door to her building sometime between 1:00 a.m. and 1:30 a.m. and that she would have seen anyone who subsequently left her building pass by her window.

The trial court summarily dismissed the petition, finding that the claims concerning the alibi witnesses were barred by *res judicata* and that, even if it did review the merits of the claims, it would have reached the same conclusion as the appellate court on direct appeal.

Goolsby appealed the denial of his post-conviction petition, reiterating the ineffective assistance of counsel claims as to Jackson, Elmore, and the Henderson's. The state appellate court declined to re-adjudicate the claims relating to Elmore and Henderson, citing *res judicata* and affirming the trial court. Regarding Jackson, the state appellate court found that claim was not barred by *res judicata*. However, the court determined that Goolsby was not prejudiced by trial counsel's failure to call her as a witness, given the strong implication of Goolsby's guilt from the rest of the record. *People v. Goolsby*, 2016 IL App (1st) 141378-U, at ¶¶ 40-45.

Goolsby then filed a post-conviction PLA with the Illinois Supreme Court, raising the ineffective assistance of counsel claims relating to Elmore, the Henderson's, and Jackson, and also attempting to revive certain post-conviction claims he had not appealed. *People v. Goolsby*, No. 121219, 2016 Ill. LEXIS 1300. The Illinois Supreme Court denied his post-conviction PLA. This habeas petition followed.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, a state petitioner seeking a writ of habeas corpus

in federal court must first exhaust the remedies available to him in state court, 28 U.S.C. § 2254(b)(1)(A), "thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (internal quotation marks omitted). To properly exhaust a claim, a petitioner must fully and fairly present federal claims through one complete round of the state appellate review process before filing a federal habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999).

If a petitioner has failed to properly assert his federal constitutional claims at each level of state review, then his claims are procedurally defaulted. *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009). Procedural default precludes federal court review of a petitioner's habeas claims. *See Mulero v. Thompson*, 668 F.3d 529, 536 (7th Cir. 2012). But a habeas petitioner may overcome procedural default by establishing: 1) cause for the default and actual prejudice, or 2) the failure to consider the claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006); *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016). A fundamental miscarriage of justice occurs when a habeas petitioner demonstrates that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986); *see also Thomas*, 822 F.3d at 386. Thus, procedural default, although otherwise an absolute prerequisite to federal habeas review, may be excused in certain circumstances.

If a habeas petitioner successfully runs the procedural-default gauntlet, then a federal court may consider the merits of his federal habeas claims. But under AEDPA, a federal court may not grant habeas relief unless the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). But just because a federal court independently concludes that the relevant state court decision applied clearly established law erroneously does not mean that the court may grant the writ; rather, the state court's application must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 155 L. Ed. 24 144 (2003). "This is a difficult standard to meet; 'unreasonable' means 'something like lying well outside the boundaries of permissible differences of opinion.'" *Jackson v. Frank,* 348 F.3d 658, 662 (7th Cir. 2003) (quoting *Hardaway v. Young*, 302 F.3d 757, 763 (7th Cir. 2002)).

## ANALYSIS

Goolsby's habeas petition argues that trial counsel was ineffective for failing to investigate and call John Elmore, Benita Jackson, Paris Henderson, Donna Henderson, Kianta Britten, Tiana Williams, and Martin Lopez at witnesses. Goolsby also generally argues that trial counsel did not prepare an adequate defense. Respondent construes this claim as a restatement of these ineffective assistance grounds (Dkt. 13 at 9), and the Court does the same.

## A. Procedural Default

Before presenting a claim in a federal habeas corpus petition, the petitioner must first give the state courts an opportunity to act on the claim. *O'Sullivan*, 526 U.S. at 842. This requires the petitioner to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845. In Illinois, that means asserting claims not just before the state appellate court, but also in a petition for leave to appeal ("PLA") to the Illinois Supreme Court. *Snow v. Nicholson*, 880 F.3d 857, 864 (7th Cir. 2018). When a habeas petitioner fails to fairly present his claim to the state courts and the opportunity to raise that claim has now passed, the claim is procedurally defaulted, and a federal court is, as a general rule, barred from reviewing the claim's merits. *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010). Here, Petitioner's claims based on his trial counsel's failure to investigate and call Elmore, Henderson, Britten, Williams, and Lopez are all procedurally defaulted, albeit for different reasons, and Petitioner's procedural default should not be excused.

### 1) Elmore and Henderson

Petitioner contends that his trial counsel rendered ineffective assistance by failing to interview and call Elmore and Henderson as witnesses. Respondent argues that this claim is procedurally defaulted because Goolsby failed to raise this claim in his direct-appeal PLA filed in the Illinois Supreme Court. (Dkt. 13 at 12) In his reply, Goolsby argues that his claim is not defaulted because he raised the claim in his post-conviction petition. However, raising a claim in a post-conviction petition does not

cure the earlier procedural default. During the proceedings on Goolsby's post-conviction petition, the state trial court ruled that the claim regarding Henderson and Elmore was barred by the doctrine of *res judicata*, because Goolsby had already obtained a merits determination on that claim in his direct appeal. *People v. Goolsby,* 2013 IL App (1st) 103358-U. The state appellate court affirmed the trial court's decision, agreeing that Goolsby's claim regarding Elmore and Henderson was barred by *res judicata. People v. Goolsby*, 2016 IL App (1st) 141378-U.

The post-conviction court's *res judicata* ruling does not count as a second, separate adjudication on the merits of Goolsby's ineffective assistance claim that overcomes his earlier procedural default. Rather, the merits ruling came on Goolsby's direct appeal, and that is the relevant ruling. *See Sutherland v. Gaetz*, 581 F.3d 614, 616 (7th Cir. 2009). The fact that Goolsby included this already-litigated claim in his post-conviction petition does not save it from the procedural default that occurred when he failed to include the claim in his direct-appeal PLA. *See United States ex rel. Logan v. Chandler*, 999 F. Supp. 2d 1047, 1080-81 (N.D. Ill. 2013) (where a claim is adjudicated on direct appeal but not included in the direct-appeal PLA, and the post-conviction appellate court later rules that re-litigation of that claim is barred by *res judicata*, the claim is not preserved for federal review by inclusion in the post-conviction pleadings). Because Goolsby failed to include this claim in his direct-appeal PLA, this claim is procedurally defaulted.

### 2) Britten, Williams, and Lopez

Respondent argues that the claims regarding Britten, Williams, and Lopez as potential witnesses are procedurally defaulted as they were not raised in one complete round of state court review. According to Respondent, these claims were not included in Goolsby's direct-appeal PLA or in his post-conviction appellate briefing.

Petitioner agrees that any ineffective assistance claims relating to Britten, Williams, and Lopez are procedurally defaulted. (Dkt. 15 at 8-9) ("But undoubtedly those points suffer from default.") However, Goolsby argues that a fundamental miscarriage of justice will occur if the Court does not excuse his default. (*Id.* at 9-10) In particular, Goolsby argues that the testimony of Britten, Williams, Lopez, Elmore, Henderson, and Jackson "would have been overwhelming proof of petitioner's innocence." (Dkt. 15 at 10)

As mentioned above, a petitioner may overcome procedural default either by demonstrating (1) cause for the default and actual prejudice from the default, or (2) that the federal court's refusal to consider the claim would result in a fundamental miscarriage of justice. *See House*, 547 U.S. at 536; *Coleman,* 501 U.S. at 750. A fundamental miscarriage of justice occurs when a habeas petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House,* 547 U.S. at 536-37 (quoting *Schlup v. Delo*, 513 U.S. 298,

327 (1995)). A claim of actual innocence must be credible, and petitioner must provide "reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Thomas*, 822 F.3d 378, 387 (7th Cir. 2016); *see also Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim.").

Goolsby has not met his burden. The evidence he provides in his favor does not meet the exacting standard set forth by the Supreme Court and the Seventh Circuit. Goolsby has not offered exculpatory scientific or physical evidence. The proposed witness testimony from Britten and Williams merely states that they did not hear anyone taunt Goolsby during the fight between Goolsby and Love. (Dkt 13, Ex. F at 103-104) As discussed more below, the alibi testimony from Jackson does not actually account for Goolsby's whereabouts at the time of the murder. The proposed alibi from Elmore lacks credibility given Elmore's familial relationship with Goolsby and that Elmore was intoxicated on the night in question.[3] (*Id.* at Ex. A ¶¶ 52, 97; Dkt. 1 at

---

[3] Petitioner has not provided affidavits for the purported testimony of Paris Henderson, Donna Henderson, or Martin Lopez. However, the potential testimony would not strengthen Petitioner's actual innocence claim: Paris Henderson claims that she was drinking and playing cards with Goolsby between 1:00 a.m. and 4:00 a.m. on the night of the murder, but indicates that Goolsby left at some point during that timeframe, and she could not remember when he did so or when he returned; Martin Lopez glimpsed several individuals run by his store after shots were fired and he did not identify Petitioner as one of the individuals; and Donna Henderson's testimony remains unknown. (Dkt. 15, Ex. A ¶¶ 49, 52, 97, 99, 110-13); *see also United States ex rel. Coleman v. Hulick*, No. 99 C 2635, 2008 WL 4067144, at *8 (N.D.

11). As Respondent notes, much of the evidence provided by Petitioner constitutes impeachment evidence, which is usually insufficient to support an actual innocence claim. *See Calderon v. Thompson*, 523 U.S. 538, 563, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998) (noting that impeachment evidence is "a step removed from evidence pertaining to the crime itself" and provides "no basis for finding a miscarriage of justice").

Viewing the record as a whole, Goolsby's new evidence does not override the overwhelming evidence of Goolsby's guilt. The evidence presented at trial demonstrated Goolsby's motive for revenge, his explicit threat to kill Davis the day before the shooting, Hardin's witnessing the murder, the Dorseys' accounts of Goolsby's bragging about the murder over the speaker phone, the medical examiner's testimony, and the Brayboy's testimony placing Goolsby near the crime scene following the shooting. (Dkt. 13, Ex. H ¶¶ 3-30, 44-45); *People v. Goolsby,* 2013 IL App (1st) 103358-U, ¶¶ 1-57. Goolsby's new evidence, which places him in an apartment drinking and playing cards at some point between 1:00 a.m. and 4:00 a.m. on the night of the murder or disputes whether he was taunted by the victim during the argument preceding the murder, viewed in tandem with the evidence presented at trial, does not convince the Court that no reasonable juror would convict Goolsby of Davis' murder.

Ill. Aug. 28, 2008) (lack of affidavits diminished credibility of witnesses supporting petitioner's actual innocence claim).

**B. Ineffective Assistance of Counsel—Benita Jackson**

The ineffective assistance of counsel claim regarding counsel's failure to investigate and call Benita Jackson as a witness is Goolsby's only claim to have run the procedural default gauntlet. This claim made it through one complete round of state court review. Therefore, the Court will reach the merits of this claim.

To receive habeas relief on the merits of an ineffective assistance of counsel claim, Goolsby must meet the familiar performance-and-prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 647 (1984). Under *Strickland*, Goolsby must show that (1) his attorney's performance fell below an objective standard of reasonableness and (2) he was prejudiced by that deficient performance. *Id.* at 687-88. To satisfy the second element, Goolsby must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Overall, judicial review of trial counsel's performance "must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight." *Id.* at 689; *see also United States v. Lathrop*, 634 F.3d 931, 937 (7th Cir. 2011).

On habeas review, the inquiry is doubly deferential: not only must the Court presume that "the challenged action might be considered sound trial strategy," *Strickland*, 466 U.S. at 689 (internal quotation marks omitted), but under AEDPA this Court must also defer to the state court's application of *Strickland* unless it is objectively unreasonable. *See Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009). To be clear, the Court is not deciding whether the

state court's determination was correct under Strickland, but rather whether it "produced an answer within the range of defensible positions." *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006) (internal quotation marks omitted). "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123.

Here, the Illinois Appellate Court held that Goolsby was not prejudiced by counsel's failure to present Jackson as an alibi witness. *People v Goolsby,* 2016 IL App (1st) 141378-U, at ¶ 44. The court concluded that Jackson's proposed testimony—that she saw Goolsby enter a door to her building between 1:00 a.m. and 1:30 a.m. and she believed she would have seen anyone who subsequently left pass by her window— would not have outweighed the overwhelming evidence of Goolsby's guilt. This overwhelming evidence included Goolsby's motive for revenge, Goolsby's explicit threat to kill the victim the day before the shooting, Hardin's eyewitness account of the shooting that was corroborated by both the Doreseys' account of Goolsby's speakerphone admission and the medical examiner's testimony, and Brayboy's testimony placing Goolsby near the crime scene following the shooting.[4] *People v Goolsby,* 2016 IL App (1st) 141378-U, at ¶¶ 44-45. In light of this evidence, the state appellate court determined that the outcome of Goolsby's trail would not have

---

[4] The court noted that: "[w]hile much of the evidence of [Goolsby's] guilt rested upon recanted statements from the witnesses, evidence admissible through the witnesses' prior inconsistent statements may be considered the same as direct testimony from those witnesses." *People v Goolsby,* 2016 IL App (1st) 141378-U, at ¶ 44 (citing *People v. McCarter*, 2011 IL App (1st) 092864, at ¶ 3). The court also determined that the substantive admission of these statements strongly implicated Goolsby in the murder.

changed had trial counsel investigated Jackson as a witness. Thus, the court held that Goolsby was not prejudiced by trial counsel's alleged error and his ineffective assistance of counsel claim failed.

The Illinois Appellate Court's determination was neither contrary to nor an unreasonable application of Supreme Court precedent. It was not objectively unreasonable for the appellate court to conclude that Goolsby was not prejudiced by counsel's performance. Accordingly, Goolsby's ineffective assistance of counsel claim fails.

## C. Certificate of Appealability

If Goolsby wishes to appeal this denial, he must first obtain a certificate of appealability. Under 28 U.S.C.§ 2253, "an appeal may not be taken to the court of appeals from the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a state court" unless the circuit justice or judge first issues the certificate. 28 U.S.C.§ 2253(c)(1)(A). A certificate of appealability may issue only when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C.§ 2253(c)(2). To make a substantial showing, a petitioner must show that "reasonable jurists could debate whether…the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (internal quotation marks and citations omitted). For the reasons discussed above, Goolsby has not made a substantial showing of the denial of a constitutional right; reasonable jurists would

not debate whether the challenges in his habeas petition should have been resolved differently, nor would they determine that Goolsby deserves encouragement to proceed further on his habeas claims. The Court declines to issue a certificate of appealability.

## **CONCLUSION**

For the reasons discussed above, Goolsby's habeas petition (Dkt. 1) is denied, and the Court declines to issue a certificate of appealability. The Clerk is instructed to enter judgment in favor of Respondent and against Petitioner.

E N T E R:

Dated: January 6, 2020

_____
MARY M. ROWLAND
United States District Judge